UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ALCOM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00152-JAW |
| | ) | |
| JAMES TEMPLE et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

A trailer manufacturer and distributor seeks a temporary restraining order to enjoin a former employee from violating his employment agreement and to prevent the former employee and his new employer from possessing, using, or disclosing the company's confidential information. The Court concludes that, while the company is likely to succeed on the merits, the company has not established that, absent temporary injunctive relief, it will suffer irreparable harm. Thus, the Court denies the motion for a temporary restraining order.

I.     **BACKGROUND**

A.     **Procedural Background**

On May 4, 2020, Alcom, LLC (Alcom) filed a verified complaint against James Temple and Black Mountain Trailers, LLC (Black Mountain) for injunctive relief and damages. *Verified Compl.* (ECF No. 1) (*Compl.*). The Verified Complaint alleges that Mr. Temple breached restrictive covenants contained in an employment contract with Alcom and has been unjustly enriched at Alcom's expense. *Compl.* ¶¶ 54-63, 71-75. The Verified Complaint further alleges that Mr. Temple and Black Mountain violated

Maine's Uniform Trade Secrets Act (MUTSA). *Compl.* ¶¶ 64-70 (citing 10 M.R.S. §§ 1541 *et seq.*). On the same day, Alcom moved for a temporary restraining order enjoining Mr. Temple from violating the restrictive covenants of his employment agreement with Alcom and enjoining Mr. Temple and Black Mountain from possessing, using, or disclosing Alcom's confidential and/or proprietary information in violation of MUTSA. *Mot. for TRO* at 1 (ECF No. 4) *(Pl.'s Mot.)*.

As noted, the Verified Complaint is verified with Daniel Mills, Sales Director of Alcom, affirming that the allegations in the Verified Complaint are true and accurate to the best of his knowledge and belief. *Compl.* at 14. Attached to the Verified Complaint are copies of an employment agreement apparently signed by James G. Temple and dated April 14, 2015, *id.*, Attach. 1, *Alcom, LLC Employee Confidentiality, Non-Disclosure, and Non-Compete Agreement* at 1-2 (*Employment Agreement*), and a cease and desist email dated April 17, 2020, from Daina J. Nathanson to "Messrs. Temple and Snyder." *Compl.*, Attach. 2, *Email from Daina J. Nathanson to Mssrs. Temple and Snyder*.

Alcom issued summonses to Black Mountain and Mr. Temple on May 4, 2020, *Summons for James Temple* (ECF No. 3); *id.*, Attach. 1, *Summons for Nathan Snyder, Manager, Black Mountain Trailer, LLC*, but there is no indication in the docket that either Defendant has been served and no counsel has entered an appearance yet on behalf of either Defendant. Upon inquiry from the Clerk of Courts to Attorney McCormick, counsel for Alcom does not know the name of counsel for the Defendants.

### B.      Factual Background[1]

#### 1.      The Parties

Alcom is a Maine corporation with its principal place of business in Winslow, Maine.  *Compl.* ¶ 1.  It is a North American aluminum trailer manufacturer and produces a diverse line of trailers, including horse and livestock trailers.  *Id.* ¶ 7. Alcom has manufacturing facilities in Maine, South Dakota, and Montana.  *Id.* ¶ 8.

Mr. Temple is an individual citizen residing in Liberty Hill, Texas.  *Id.* ¶ 2.  He is a former employee of Alcom.  *Id.*

Black Mountain is a Nevada corporation with a principle place of business in Las Vegas, Nevada.  *Id.* ¶ 3.  It is in the business of horse trailer manufacturing and distribution to dealers and is a direct competitor of Alcom.  *Id.* ¶¶ 3, 43.

#### 2.      Alcom LLC's Business, Business Model, and Trade Secrets

Alcom serves more than 650 custom base dealers, including approximately thirty-four horse and livestock trailer dealers, throughout the United States, Australia, China, India and Kuwait.  *Id.* ¶ 8.  Alcom's customers are dealers who, in turn, sell to end users.  *Id.* ¶ 9.  Alcom's business model depends on fostering, growing, and protecting its relationships with dealers so that they continue to look to Alcom to fulfill these business needs as they arise.  *Id.* ¶ 10.  Alcom's business model fosters and grows its relationship with dealers through the use of a highly trained sales force consisting of six full time sales representatives.  *Id.* ¶ 11.

---

[1]      The Court recites the pertinent contents of the Verified Complaint and assumes their truth for purposes of the Motion for Temporary Restraining Order.

3

To be successful, a sales representative in the trailer industry must have technical knowledge about the product that Alcom manufacturers as well as strong interpersonal skills in order to develop the trust and loyalty of its customers. *Id.* ¶ 12. Accordingly, Alcom invests substantial resources in its sales representatives when they are hired and throughout their employment. *Id.* ¶ 13. When they are hired, Alcom's sales representatives receive specialized training regarding Alcom's products, and throughout their tenure as employees, they are provided with Alcom's customer lists, pricing information, sales and marketing strategy, and financial information so that they are able to have a competitive advantage over other trailer manufacturers in the market. *Id.* ¶ 14.

In addition to the training, product specialization, geographical protection, and other support that Alcom provides its sales representatives as part of its business model, it also provides sales representatives with certain valuable trade secret information for use in the course of their work for Alcom. *Id.* ¶ 17. Over its fourteen years in business, Alcom has developed a comprehensive and proprietary body of information, including customer lists and information, preferences of existing customers, pricing strategies and information, sales techniques, and financial data. *Id.* ¶ 18. Alcom takes meticulous care to guard its customer and sales information from disclosure outside of the company, including by making the information accessible only with the use of individually assigned and trackable passwords. *Id.* ¶ 19. In addition, Alcom requires all employees with access to trade secret

information to execute a confidentiality agreement as a condition of their employment. *Id.* ¶ 20.

### 3. James Temple's Employment with Alcom, LLC

On or about April 14, 2015, Alcom hired Mr. Temple to work as a full-time sales representative with a focus on horse and livestock trailers. *Id.* ¶ 21. Mr. Temple was the sole salesperson in all of North America for the Frontier line of trailers, which is a line of aluminum horse trailers and livestock trailers ranging in sizes for single to multiple horses and different types of livestock. *Id.* Mr. Temple's job responsibilities consisted of developing and maintaining sales leads and growing Alcom's presence and book of business for all dealers with horse and livestock trailer needs in North America. *Id.*

As a material condition of his employment, Mr. Temple was required to, and did sign, a Confidentiality, Non-Disclosure, and Non-Compete Agreement (Employment Agreement). *Id.* ¶ 22. The Employment Agreement contained a provision entitled "Non-Disclosures of Confidential Information" whereby Mr. Temple agreed "[a]t all times during and subsequent to [his] employment with the Company . . . to keep in strictest confidence the Company's Confidential Information" and that he would "not use, disclose or duplicate the Company's Confidential Information without the written consent of the Company . . .." *Id.* ¶ 23 (quoting *Employment Agreement* at 1-2). In addition, Mr. Temple agreed to return all confidential information in his possession upon termination of his employment. *Id.* (citing *Employment Agreement* at 2).

5

The Employment Agreement also contained a "Non-Solicitation of Customers" provision whereby Mr. Temple agreed not to "[s]olicit, attempt to solicit, or accept work of any kind, either on [his] own or as an employee, employer, consultant, agent, principal, partner, shareholder, or in any other individual or representative capacity, from any customer or customer-referral source for the Company with whom [he] had contact during [his] employment." *Id.* ¶ 24 (quoting *Employment Agreement* at 2). The Employment Agreement stated that

> "customer" shall mean any person, business, or entity (i) to whom the Company has provided products or services within the one (1)-year period preceding the termination of [his] employment, or (ii) from whom [he] know[s] the Company is actively soliciting business with[in] the one (1)-year period preceding the termination of [his] Employment.

*Id.* (quoting *Employment Agreement* at 2).

Additionally, the Employment Agreement contained a "Non-Competition" provision whereby Mr. Temple agreed, during his employment and for a period of twenty-four months following termination of his employment, not to "[p]articipate in the ownership or control of, act as an employee, agent, or contractor of, or directly or indirectly engage in or render services to or on behalf of any person or entity that conducts business in North America and is competitive with the Company." *Id.* ¶ 25 (quoting *Employment Agreement* at 2).

The Employment Agreement also stated that Alcom has a legitimate need to protect itself from improper or unfair competition and to protect its confidential information and that, due to the highly competitive nature of Alcom's business, a breach by Mr. Temple of the restrictive covenants would cause Alcom irreparable

injury. *Id.* ¶ 26-27. Mr. Temple agreed in the Employment Agreement that Alcom would be entitled to seek injunctive relief to prevent him from violating the restrictive covenants. *Id.* ¶ 28.

Throughout his employment with Alcom, Mr. Temple had daily and weekly contact with dealers, and established, on behalf of Alcom, customer trust and goodwill with the dealers within his product line and territory resulting in over $2 million in revenue for Alcom on an annual basis. *Id.* ¶¶ 30, 32. While working as a sales representative for Alcom, Mr. Temple was exposed to highly confidential sales and marketing information, including programs to incentivize sales by the provision of discounts, which information is highly confidential and should not be revealed to competitors and which Alcom takes extensive efforts to protect from misuse and disclosure. *Id.* ¶ 33. In addition, Mr. Temple gained unique insight into the needs and operational requirements of the dealers he solicited within his territory on Alcom's behalf, including information about dealers' target customer base, customer profiles, decision makers, and marketing strategies. *Id.* ¶ 34.

### 4. James Temple's Resignation from Alcom, LLC and Subsequent Employment with Black Mountain Trailers, LLC

On or about March 13, 2020, Mr. Temple resigned from employment with Alcom, representing to the company that he and his wife planned to go into the property management business—a representation he knew at the time was false. *Id.* ¶¶ 35-36. This representation was false and Mr. Temple knew it was false when he made it. *Id.* ¶ 36. Contrary to Mr. Temple's representations to Alcom, in violation of

7

his Employment Agreement, he planned to accept employment with Black Mountain. *Id.* ¶ 37. Mr. Temple was negotiating his employment with Black Mountain before he left Alcom and, in so doing, both he and Black Mountain were aware that his employment with Black Mountain would be a breach of his Employment Agreement. *Id.* ¶ 38. On his last day of employment with Alcom on March 13, 2020, Mr. Temple deleted the vast majority of information and communications on his company-issued laptop and company email account. *Id.* ¶¶ 39-40. He also requested Alcom's price books for the Frontier line of trailers for east coast and west coast customers. *Id.* ¶ 41. Alcom's business records do not show that he was working on any last-minute sales—let alone multiple sales on two different coasts—on his last day of work. *Id.* ¶ 42.

Immediately after leaving Alcom, Mr. Temple began working as the Director of Sales and Marketing at Black Mountain, and Alcom believes he has an ownership interest in Black Mountain. *Id.* ¶ 44. In April 2020, Alcom began to receive reports from dealers formerly serviced by Mr. Temple that he was soliciting their business on behalf of Black Mountain, including one dealer who is now working with Black Mountain. *Id.* ¶¶ 45-46. Some of the dealers that Mr. Temple is soliciting are Alcom's most profitable dealers. *Id.* ¶ 47. Of the dealers that Alcom knows Mr. Temple is soliciting, their cumulative sales for 2019 were approximately $2.7 million. *Id.*

Mr. Temple's sales efforts for Black Mountain means that he is competing directly against Alcom. *Id.* ¶ 48. In competing against Alcom, Mr. Temple is using and imparting to Black Mountain his knowledge of confidential and proprietary

information, including, but not limited to, his knowledge of pricing, discounts, and promotional programs offered by Alcom to its dealers and Alcom's pricing strategies, profit margins, and related confidential information. *Id.* ¶ 49. Mr. Temple is trading on the goodwill he fostered while employed with Alcom to harm Alcom's reputation and business. *Id.* ¶ 50. Alcom is suffering harm to its goodwill and reputation and will also suffer significant sales losses as a result of Mr. Temple's misconduct. *Id.* Immediately upon learning of Mr. Temple's misconduct, Alcom sent Mr. Temple and Black Mountain a cease and desist letter dated April 17, 2020. *Id.* ¶ 51. Despite giving Mr. Temple and Black Mountain ten days to provide assurances that they would honor the terms of Mr. Temple's Employment Agreement, no such assurances have been made. *Id.* ¶ 52. Mr. Temple is continuing his employment at, and suspected ownership of, Black Mountain, and continuing to solicit Alcom's dealers in violation of his Employment Agreement. *Id.* ¶ 53.

## II.    ALCOM, LLC'S MOTION

Alcom argues that it is entitled to a temporary restraining order because it meets every element of the four-factor analysis that applies to parties seeking a temporary restraining order or preliminary injunction. *Pl.'s Mot.* at 6-7. First, Alcom asserts, it "is likely to succeed on the merits of its claims because the Employment Agreement at issue is valid and enforceable," *id.* at 7 (citing *Securadyne Sys., LLC v. Green*, No. 2:13-cv-387-DBH, 2014 WL 1334184, at *5 (D. Me. Apr. 2, 2014)), and because "[Mr.] Temple is employed by a direct competitor and is soliciting customers . . .." *Id.* Alcom states that "[t]he non-competition and non-solicitation

covenants are reasonable in scope and are necessary to protect Alcom's legitimate business interests, to prevent former employees from taking existing customers with them, to protect customer goodwill, and to protect Alcom's reputation." *Id.* at 8. Alcom also argues that it has shown it is likely to succeed on its trade secrets claim because "[Mr.] Temple and Black Mountain are using, without the consent of Alcom, trade secrets [Mr.] Temple obtained under circumstances giving rise to a duty to maintain their secrecy," including confidential pricing, sales figures, and account histories. *Id.* at 12-13.  Finally, Alcom contends that "[Mr.] Temple has been unjustly enriched to Alcom's detriment by trading on Alcom's customer good will for his own and Black Mountain's benefit." *Id.* at 7.

Second, Alcom asserts that, "[a]s [Mr.] Temple specifically agreed when he signed the Employment Agreement," it is suffering irreparable harm beyond economic damages because of Mr. Temple and Black Mountain's violation. *Id.* at 13. Specifically, Alcom states, the violation is costing Alcom "customer good will" and the loss of trade secrets. *Id.* at 13-14. Alcom argues that it "will continue to sustain substantial and irreparable loss of good will and reputation if [Mr.] Temple is not enjoined from soliciting Alcom's customers" and that not enjoining them will "destroy[] the goodwill which Alcom has diligently generated over fourteen years of doing business, and which Alcom specifically contracted with [Mr.] Temple to protect, and has since demanded that [Mr.] Temple and Black Mountain cease using but to no avail." *Id.* at 14.

Third, Alcom states that the balance of harms weighs in favor of injunctive relief because Mr. Temple's conduct is causing irreversible harm that is difficult to quantify, including lost sales, lost referrals, and lost goodwill. *Id.* at 14. By contrast, Alcom argues, if injunctive relief were granted, Mr. Temple would be free to use his sales skills generally and would only be prohibited from working for a direct competitor or soliciting Alcom's customers for twenty-four months. *Id.* at 14-15.

Fourth, Alcom asserts that injunctive relief promotes the public interest because "[i]t is within the public interest to prevent misappropriation of trade secrets, breaches of contracts, and damage to local businesses." *Id.* at 15. Any negative public policy rationales concerning non-competition agreements, Alcom continues, do not apply to this case, where the Employment Agreement is enforceable. *Id.*

Alcom concludes by pointing out that Mr. Temple and Black Mountain have not responded to Alcom's cease and desist letter and are continuing to solicit Alcom's clients and suggesting that they will continue to do so, "only exacerbat[ing] the irreversible damage," unless the Court orders them to stop. *Id.*

## III.   LEGAL STANDARD

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). A judge should use his or her authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981); *see*

*also Augusta News Co. v. News Am. Publ'g, Inc.*, 750 F. Supp. 28, 31 (D. Me. 1990) ("Preliminary injunctions must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain").

To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for a preliminary injunction. *Animal Welfare Inst. v. Martin*, 665 F. Supp. 2d 19, 22 (D. Me. 2009); *see also Faria v. Scott*, No. 16-cv-49-JD, 2016 U.S. Dist. LEXIS 25070, at *1 (D.N.H. Feb. 9, 2016); *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 337 (D.N.H. 2006); *Largess v. Supreme Judicial Court for Mass.*, 317 F. Supp. 2d 77, 81 (D. Mass. 2004) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993)). The four factors are:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18. The same is true with respect to a temporary restraining order. *Martin*, 665 F. Supp. 2d at 22. Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## IV.   DISCUSSION

The Court analyzes the four factors Alcom must establish in turn.  The Court determines that, while Alcom has shown likelihood of success on the merits of Counts I and II, it has not shown that it will suffer irreparable harm without a temporary restraining order.  The last two factors are neutral or weigh slightly in favor of the temporary restraining order.  However, given the lack of showing of irreparable injury, the Court concludes that a temporary restraining order is not appropriate.

### A.   Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007))).  The Court discusses the merits of Alcom's breach of contract and trade secret claims in turn.[2]

### 1.   Count I: Breach of the Employment Agreement

Alcom argues that it is likely to succeed on its breach of contract claim because the Employment Agreement, including its restrictive covenants, is valid and enforceable and because Mr. Temple breached it by working for Black Mountain and

---

[2]     Count III of Alcom's Verified Complaint alleges that Mr. Temple has been unjustly enriched by Alcom.  *Compl.* ¶¶ 71-75.  Alcom does not argue the merits of this count in its motion, and the Court rests its decision on Counts I and II.  Thus, it is unnecessary to reach the likelihood of Alcom's success on the merits for Count III.

soliciting Alcom's dealers. *Pl.'s Mot.* at 7-8. Whether Alcom is likely to succeed on its breach of contract claim comes down to the enforceability of the Employment Agreement, not Mr. Temple's actions. If the Employment Agreement is enforceable, Mr. Temple breached it by leaving Alcom to join its competitor and actively soliciting Alcom's dealers.

Under Maine law, non-competition agreements are "contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Lord v. Lord*, 454 A.2d 830, 834 (Me. 1983). "Whether a noncompetition agreement is reasonable is a question of law to be determined by the court." *Chapman & Drake v. Harrington*, 545 A.2d 645, 647 (Me. 1988). The reasonableness of a specific covenant must ultimately be "determined by the facts developed in each case as to its duration, geographic area, and the interests sought to be protected." *Securadyne Sys.*, 2014 WL 1334184, at \*5 (quoting *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995)). Courts assess a non-competition agreement as the employer "has sought to apply it and not as it might have been enforced on its terms." *Securadyne Sys.*, 2014 WL 1334184, at \*5 (quoting *Brignull*, 666 A.2d at 84).

The Maine Law Court commented that "protecting an employer from business competition is not a legitimate business interest to be advanced by [a non-competition] agreement." *Brignull*, 666 A.2d at 84. However, a covenant not to compete may be reasonable "when the employee during his term of employment has had substantial contact with his employer's [confidential information, including

14

customers], and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business." *Chapman & Drake,* 545 A.2d at 647; *see OfficeMax Inc. v. Cty. Qwick Print, Inc.*, 709 F. Supp. 2d 100, 107 (D. Me. 2010). In such a situation, an employer may "prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment, and from enticing away old customers . . .." *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 15, 770 A.2d 97, 103 (quoting *Roy v. Bolduc,* 140 Me. 103, 107, 34 A.2d 479, 480-81 (Me. 1943)).

Mr. Temple's Employment Agreement protects Alcom from the situation contemplated in *Chapman & Drake* and the other cases raised by the Court. The present facts, as alleged, are similar to those in *Everett J. Prescott, Inc. v. Ross.* 383 F. Supp. 2d 180 (D. Me. 2005). In *Ross*, the employee engaged in outside sales at the plaintiff company for eleven years, had direct contact with customers, and was aware of the company's pricing practices. *Id.* at 190. The evidence established that he "possessed confidential business information, ranging from customer lists to proprietary business practices, which if available to a competitor, would likely affect [the plaintiff's] good will; precisely, the type of information Maine law allows an employer to protect." *Id.* at 190-91.

Here, Mr. Temple worked for Alcom for almost five years and had direct contact with all of Alcom's dealers for horse and livestock trailers in North America, some on a daily basis. *Compl.* ¶¶ 21, 30, 35. As a sales representative, he had access to customer lists, pricing information, sales and marketing strategy, and financial

information.  *Id.* ¶ 14.  He worked with highly confidential sales and marketing information and gained insight into the needs and operational requirements of the dealers he solicited.  *Id.* ¶¶ 33-34.  Mr. Temple is in a prime position to "take for his own benefit the good will his employer paid him to help develop for the employer's business."  *Chapman & Drake*, 545 A.2d at 647 (citations omitted).  In fact, based on the allegations in the Verified Complaint, that is just what Mr. Temple has done.  He is contacting Alcom's dealers and soliciting their business on behalf of Black Mountain and, in at least one case, he is succeeding.  *Comp.* ¶¶ 45-47.  One can only guess what insights he is sharing with Black Mountain and the dealers in the process, but he at least appears to be sharing customer lists.  As in *Ross,* the allegations in the Verified Complaint establish that Mr. Temple possesses the type of information that Maine law allows an employer to protect.

Moreover, the restrictive covenants in the Employment Agreement are reasonable in duration and scope.  The restrictive covenants are limited in time to two years, "well within the permitted time limits."  *Securadyne Sys.*, 2014 WL 1334184, at *6 (citing *Ross,* 383 F. Supp. 2d at 191 (finding three years reasonable); *Brignull,* 666 A.2d at 83 (finding four years reasonable); *Chapman & Drake,* 545 A.2d at 646, 648 (finding five years permissible for prohibition of soliciting or accepting business from former customers)).  While the geographic limitation is broad, encompassing all of North America, Mr. Temple's role as Alcom's sole salesperson in North America for the Frontier line of trailers justifies this scope, which is limited by type of trailer rather than geographical location.  *See Compl.* ¶ 21.  Finally, the

restrictive covenants do not prevent Mr. Temple from using his sales expertise in an industry other than horse and livestock trailers.

The Court concludes that, based on the allegations in the Verified Complaint, Alcom has established a likelihood of success on the merits that the Employment Agreement is enforceable and that Mr. Temple breached it.

### 2.      Count II: Violation of MUTSA

Alcom asserts that it has demonstrated a likelihood of success on the merits of its trade secrets claim against Mr. Temple and Black Mountain because they are using, without Alcom's consent, trade secrets Mr. Temple obtained under circumstances giving rise to a duty to maintain their secrecy in violation of MUTSA. *Pl.'s Mot.* at 12.  MUTSA allows courts to restrain or enjoin someone from actual or threatened misappropriation.  10 M.R.S. § 1543.  In this context, "misappropriation" includes

> "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]quired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . .."

10 M.R.S. § 1542(2).  "Trade secret" means information that (1) "[d]erives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use" and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  10 M.R.S. § 1542(4).

The Maine Supreme Judicial Court provided the following factors to help courts determine whether information derives independent value from not being known or readily ascertainable:

> (1) the value of the information to the plaintiff and to its competitors; (2) the amount of effort or money the plaintiff expended in developing the information; (3) the extent of measures the plaintiff took to guard the secrecy of the information; (4) the ease or difficulty with which others could properly acquire or duplicate the information; and (5) the degree to which third parties have placed the information in the public domain or rendered the information "readily ascertainable" through patent applications or unrestricted product marketing.

*Blue Sky W., LLC v. Me. Revenue Servs.*, 2019 ME 137, ¶ 35, 215 A.3d 812, 824 (quoting *Spottiswoode v. Levine*, 1999 ME 79, ¶ 27 n.6, 730 A.2d 166, 174 n.6). Moreover, the Maine Supreme Judicial Court established factors for courts to consider in determining whether the owner of the information has made reasonable efforts to maintain its secrecy:

> (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which employees and others involved in the plaintiff's business know the information; (3) the nature and extent of measures the plaintiff took to guard the secrecy of the information; (4) the existence or absence of an express agreement restricting disclosure; and (5) the circumstances under which the information was disclosed to any employee, to the extent that the circumstances give rise to a reasonable inference that further disclosure without the plaintiff's consent is prohibited.

*Id.* (quoting *Spottiswoode*, 1999 ME 79, ¶ 27 n.7).

The First Circuit noted that, when viewing evidence in the light most favorable to the verdict on appeal, "it is a logical inference that a competitor who hires away a rival's valued employee with access to inside information has done so in order to use

that inside information to compete with the rival . . . ." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009).

Here, the customer and sales information that Mr. Temple possesses fits the definition of a trade secret. First, it derives independent economic value from not being generally known. Alcom put in substantial effort and money to develop the customer information, hiring Mr. Temple to develop the dealer list for the Frontier line of trailers in North America and paying him for five years to do so. *Compl.* ¶ 21. Alcom only hires six full-time sales representatives, and there is evidence of Alcom's investment in training and supporting Mr. Temple. *See id.* ¶¶ 11-14. The information was valuable, with the dealers within Mr. Temple's product line resulting in over $2 million in revenue for Alcom on an annual basis. *See id.* ¶ 32. Additionally, Alcom protected this information by making it accessible only with the use of individually assigned and trackable passwords and requiring all employees with access to the information to execute a confidentiality agreement, like Mr. Temple's Employment Agreement, as a condition of their employment. *See id.* ¶¶ 19-20. These protections made it hard for others to acquire or duplicate the information, at least without detection. Finally, there is no evidence that this information, particularly the sales and marketing strategies, was public. Without this information, Black Mountain would have to develop its own lists and sales strategies and would be less able to take profits away from Alcom. The factors weigh in favor of finding that the customer and sales information Mr. Temple is using at Black Mountain derives independent economic value from not being generally known.

Second, Alcom has made reasonable efforts to maintain the secrecy of the information.  As discussed above, Alcom protected the information from many of its own employees through a trackable password system and required any employee who did have access to the information to sign a confidentiality agreement expressly restricting disclosure.  *See id.*  Mr. Temple himself signed the Employment Agreement, which restricted disclosure of confidential information.  *Id.* ¶¶ 22-23. Moreover, Alcom's business records show that Mr. Temple deleted information from his work laptop and email and requested price books for the Frontier line of trailers on his last day of employment with Alcom despite not working on any last-minute sales on Alcom's behalf.  *Id.* ¶¶ 41-42.  The fact that Alcom's records show this activity demonstrates Alcom's close attention to its employee's access to confidential information.  Overall, based on the allegations in the Verified Complaint, Alcom has shown its efforts were reasonable under the circumstances to maintain the secrecy of its confidential information.

Since the customer lists and other information qualify as trade secrets, Mr. Temple and Black Mountain's use of the customer lists, and perhaps more, to contact and solicit Alcom's dealers constitutes misappropriation.  Mr. Temple knew that he had a duty to maintain the secrecy of the information because the Employment Agreement he signed explicitly said so, and he did not.  Moreover, as in *Astro-Med*, the Court makes the logical inference that Black Mountain, Alcom's competitor, hired Mr. Temple, Alcom's valued employee with access to inside information, to use that inside information to compete with Alcom.  *See Astro-Med*, 591 F.3d at 19.

The Court concludes that Alcom has established a likelihood of success on the merits that Mr. Temple and Black Mountain violated MUTSA.

**B.    Irreparable Harm**

Alcom claims that it will suffer irreparable harm without injunctive relief because the loss of customer goodwill, referral sources, and customer contacts cannot be measured in monetary damages and, in the case of goodwill, is difficult to reestablish once lost. *Pl.'s Mot.* at 13-14.

"It is a long standing axiom that 'economic harm in and of itself is not sufficient to constitute irreparable injury.'" *Ross*, 383 F. Supp. 2d at 191 (quoting *Merrill Lynch,* 839 F. Supp. at 74-75). Also, "[s]peculative injury 'does not constitute a showing of irreparable harm.'" *Id.* (quoting *Merrill Lynch,* 839 F. Supp. at 74-75).

"A business's interests in good will, customer contacts, and referral sources 'cannot be measured in numerical or monetary terms, and neither can the damages to these interests that plaintiff will suffer without injunctive relief.'" *Id.* at 192 (quoting *SizeWise Rentals, Inc. v. Mediq/PRN Life Support Servs., Inc.*, 87 F. Supp. 2d 1194, 1200 (D. Kan. 2000), *aff'd*, 216 F.3d 1088 (10th Cir. 2000)).  "Further, it would be 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" *Id.* (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)).

However, when the evidence of irreparable injury is limited and the direct economic damage caused by the defendant would "more readily be compensated by a

monetary award for the brief period of time between the resolution of the temporary restraining order and the resolution of the preliminary injunction," a finding that the plaintiff will suffer irreparable harm is not merited.  *See OfficeMax*, 709 F. Supp. 2d at 114 & n.7.  Further, loss of goodwill, particularly when speculative, "is frequently valued and recompensed in litigation," and "[t]here is shown to be no pattern of insufficiency in such damage awards or any systemic obstacles to their fruition." *Frank Martin Sons, Inc. v. John Deere Const. & Forestry Co.*, 542 F. Supp. 2d 101, 106 n.5 (D. Me. 2008) (quoting *Merrill Lynch*, 839 F. Supp. at 75).

Here, as in *OfficeMax*, Alcom has not provided enough evidence for the Court to conclude that monetary damages are insufficient.  While there is evidence that one of Alcom's dealers—Producers Co-Op Trailers—is now a customer of Black Mountain, there is also evidence that four of Alcom's dealers contacted Alcom to inform it that they received communications from Mr. Temple and/or Black Mountain.  *See Compl.* ¶ 46.  This evidence shows that the goodwill Alcom has developed with its dealers is strong enough for the dealers to inform Alcom about Mr. Temple and Black Mountain's activity.  Further, it is not clear from the Verified Complaint that Producers Co-Op Trailers has stopped purchasing from Alcom.  The claims by Alcom regarding loss of customer goodwill and referral sources are speculative and Alcom has not explained in any detail why the damages cannot be valued.  In the context of this motion, the Court cannot conclude that Alcom will suffer irreparable harm if it does not grant a temporary restraining order.

C.     **Balance of the Equities**

Alcom argues that the balance of harms weighs in favor of injunctive relief because Alcom will lose significant business across the country without a temporary restraining order while Mr. Temple will only be prohibited from working for a direct competitor of Alcom and soliciting Alcom's customers for twenty-four months. *Pl.'s Mot.* at 14-15.

"A court must be concerned not only with possible injury to a plaintiff but also with possible injury to the defendant, since the court is 'obliged to choose the course likely to cause the least injury.'" *Ross*, 383 F. Supp. 2d at 192 (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Ne. Airlines, Inc.,* 473 F.2d 549, 553 (1st Cir. 1972). "Proper restrictive covenants cannot preclude former employees from 'following any trade or calling for which he is fitted and from which he may earn his livelihood' or 'exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment.'" *Id.* (quoting *Roy,* 34 A.2d at 481).

Here, the balance of the equities does not weigh substantially toward either party. Without injunctive relief, Alcom is at risk of losing customers due to Mr. Temple's solicitation of Alcom's dealers, which is still going on despite Alcom's cease and desist letter. *See Compl.* ¶¶ 51-53. However, it has been less than a month since Alcom sent its letter, and Alcom only has confirmation of one dealer that is now a customer of Black Mountain. *See id.* ¶ 46. On the other hand, with a temporary restraining order, Mr. Temple will lose his employment at Black Mountain and will

not be able to work in sales that compete with Alcom's business anywhere in North America.  *See id.* ¶ 25.  He will be able to use his sales skills generally, though, so he will be able to earn a livelihood in a calling to which he is fitted and exercise the skill and general knowledge he acquired in his five years working at Alcom.  Both parties are at risk of some immediate loss, but neither party has certain permanent damage.

For these reasons, the Court concludes that the balance of equities falls in the middle of the scale and favors neither party.

### D.   Public Interest

Alcom asserts that injunctive relief promotes the public interest in the case because the Employment Agreement is enforceable and it is within the public interest to prevent misappropriation of trade secrets, breaches of contracts, and damage to local businesses.  *Pl.'s Mot.* at 15.  "The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief."  *Ross*, 383 F. Supp. 2d at 193 (citing *United States v. Zenon*, 711 F.2d 476 (1st Cir. 1983)).  The Maine Supreme Judicial Court, in holding that "non-competition agreements are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue," has weighed the public policy reasons for what type of covenant an employer can enforce.  *Securadyne Sys.*, 2014 WL 1334184, at *8-9 (quoting *Lord*, 454 A.2d at 834).

Since the Court concludes that the restrictive covenants here are likely enforceable, considering in that analysis the underlying public policy grounds, it determines that there are no other public interest concerns that prohibit a temporary restraining order.

Finally, the Court considered that it has been presented only with Alcom's side of the story.  Once Black Mountain and Mr. Temple have had an opportunity to respond to the allegations in the Verified Complaint, the enforceability of the Employment Agreement, the charge of the misuse of trade secrets, and the other allegations, the Court will revisit the injunction issue with a better understanding of the positions of the parties.  This decision is without prejudice to Alcom's companion motion for a preliminary injunction once Black Mountain and Mr. Temple have been served, have entered appearances in this matter, and have had an opportunity to be heard.

## V.    CONCLUSION

The Court DENIES Alcom, LLC's Motion for Temporary Restraining Order against James Temple and Black Mountain (ECF No. 4).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of May, 2020